Betty CARTER, Individually and as Administratrix of the Estate of John Wallace Carter, Deceased, Plaintiff–Appellant,

v.

AMERICAN OIL COMPANY, et al., Defendants–Appellees.

No. 97–1816.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 23, 1997.

Decided March 26, 1998.

Rehearing Denied May 8, 1998.

Robert G. Berger (argued), Highland, IN, John R. Stanish, Edward J. Raskosky, Hammond, IN, for Plaintiff–Appellant.

Anthony DeBonis, Jr. (argued), Terrance L. Smith, Smith & DeBonis, Highland, In, for American Oil Company.

Before BAUER, FLAUM, and EASTERBROOK, Circuit Judges.

FLAUM, Circuit Judge.

John Wallace Carter, an employee of the Union Tank Car Company (UTLX), died of asphyxiation inside a railroad tank car that was filled with pure nitrogen. His widow, Betty J. Carter, filed this wrongful death claim in the district court, pursuant to the court's diversity jurisdiction. She alleged that American Oil Company (Amoco), at whose refinery Carter was working, as well as Lyondell Petrochemical Company (Lyondell) and Tri–Central Marine Terminal, Inc. (Tri–Central), which were both allegedly responsible for storing the nitrogen in the tank car, negligently caused her husband's death. Magistrate Judge Rodovich, presiding over the case with the parties' consent, granted summary judgment to all of the defendants. We affirm.

## I. Background

The basic facts surrounding John Carter's tragic death are not in dispute. Carter, a veteran of nearly forty years in the railroad and petroleum industries, was a UTLX employee at the time of his death in 1989. He was permanently assigned to Amoco's refinery in Whiting, Indiana, where UTLX had its own office and was under contract with Amoco to clean, repair, and maintain Amoco's tank cars. The mineral oil that Amoco shipped to its customers in the tank cars sometimes left behind residue or sediment in the car. When the amount of residue in a tank car was small, Amoco would arrange to have the car "wiped down" manually with rags, rather than request a full steam or chemical cleaning. This wipe-down procedure required workers to operate inside the confined space of the tank car. When Amoco wanted UTLX to wipe down one of its cars, an Amoco employee would telephone the UTLX office and notify UTLX that a wipe-down was requested.

At Amoco's Whiting refinery, UTLX employed a manager and two other employees along with Carter. UTLX maintained a confined space entry policy that detailed the procedures that UTLX employees were required to follow before entering confined spaces such as tank cars. The policy prohibited employees from entering any confined spaces that were not tagged with a "Safe to Enter" card, and it directed employees to assume that any confined space that did not have a UTLX tag was hazardous to their lives, irrespective of whether another company had tagged a car "safe". In order to determine that a confined space was in fact safe, UTLX employees were required to use an "Ecolyzer 400" machine to test the oxygen sufficiency of the atmosphere inside the confined space. Carter was aware of these policies, and UTLX trained him to use an Ecolyzer 400. According to Betty Carter, her husband "was very safety-minded"—just one month before his accident, Carter had refused to enter a tank car that did not indicate that it was safe to enter.

On June 1, 1989, Amoco had shipped tank car GATX 40998, which contained 24,000 gallons of white mineral oil, from its Whiting plant to Tri–Central, located in Lemont, Illinois. The mineral oil actually had been purchased from Amoco by Lyondell; pursuant to a contract with Lyondell, Tri–Central would accept Lyondell's shipments of mineral oil, store them, and transfer the oil directly to Lyondell's customers. Tri–Central typically off-loaded mineral oil from a tank car by injecting nitrogen gas into a pipe at the top of the car. This created sufficient pressure to force the oil out of a pipe at the bottom of

the tank car. While the method effectively preserved the purity of the mineral oil, it was also quite dangerous, since nitrogen gas displaces air to create an oxygen-deficient atmosphere. Because of the heightened danger posed by using nitrogen in this manner, Tri-Central sometimes used compressed air instead of nitrogen prior to 1989. In October 1988, Lyondell directed Tri-Central to use nitrogen exclusively.

After off-loading all of the mineral oil from car GATX 40998, Tri-Central made arrangements to ship the now oxygen-deficient car back to Amoco's plant in Whiting. The car arrived at the plant sometime on or before August 1, 1989. Although Tri-Central's stated practice was to affix paper tags warning "Danger Nitrogen Blanket" on tank cars that had been off-loaded with nitrogen, no tags were on the car when it returned to Whiting. Amoco was not otherwise made aware that the car contained nitrogen; Amoco did not use nitrogen at its Whiting plant for either loading or off-loading mineral oil. Two Amoco employees examined the inside of the tank car and noticed debris at the bottom of the tank. They determined that the car needed a wipe-down; they sealed the car and notified their supervisor. The employees did not notice any warning tags, and they did not place any of Amoco's tags or signs on the car, since they were not aware that the car contained nitrogen and they knew that both Amoco and UTLX employees adhered to their own confined space entry procedures.

Barbara Tomko, an Amoco employee, left a message on the telephone answering machine in the UTLX office requesting that UTLX wipe down tank car GATX 40998. UTLX manager Tom Gruener apparently assigned the task to Carter and Doug Anderson.[1] Later that day, both Carter and Anderson were found lying unconscious at the bottom of the car. Carter died from asphyxiation due to the oxygen-deficient atmosphere in the tank car. While Anderson survived, he had no memory of the incident. No tags were found on the car indicating that it had been tested or that it was safe to enter; UTLX's Ecolyzer 400 was found in the UTLX office, which was about half a mile away from the tank

car. The Ecolyzer 400 subsequently was tested and found to be working properly; tank car GATX 40998 was also tested and found to have an oxygen-deficient atmosphere.

In the district court, the appellant claimed that Amoco, along with Tri-Central and Lyondell, negligently caused her husband's death. The district court awarded summary judgment to all three defendants. The court found as a matter of law that UTLX was an independent contractor, and it found that Carter had presented no evidence to support a contrary inference. The court then determined that Amoco had not otherwise assumed a duty to protect UTLX employees. Furthermore, the court held that as a landowner Amoco did not have a duty to warn Carter of the known hazards posed by entry into confined spaces. The district court awarded summary judgment to Tri-Central because the evidence did not create an inference that Tri-Central's negligence—in failing to attach durable nitrogen warning tags to the tank car—proximately caused Carter's death. Because Lyondell's liability was premised vicariously on Tri-Central's liability, the court awarded summary judgment to Lyondell as well.

## II. Discussion

As always, we review an award of summary judgment by the district court *de novo*. We construe the evidence and all reasonable inferences that can be drawn therefrom in the light most favorable to Carter, the nonmoving party. *See, e.g., Bruner Corp. v. R.A. Bruner Co.*, 133 F.3d 491, 495 (7th Cir.1998). Applying these principles, summary judgment is appropriate only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Newell v. Westinghouse Elec. Corp.*, 36 F.3d 576, 578 (7th Cir.1994). Carter argues that the record contains considerable evidence that establishes genuine issues of fact with respect

1. Tom Gruener died before the appellant filed suit in the district court.

to the liability of each of the defendants. We address these contentions in turn.

### A. Amoco's Liability

Carter argues that summary judgment was inappropriately granted to Amoco for two reasons. First, she asserts, substantial evidence in the record indicates that Amoco exercised sufficient control over UTLX employees to establish an agency relationship, as opposed to an independent contractor arrangement.[2] Second, she argues that even if UTLX was an independent contractor, Amoco independently assumed a duty to protect UTLX employees. Viewing the evidence in the light most favorable to Carter, we reject these arguments.

### 1. UTLX's Independent Contractor Status

 An independent contractor, as opposed to an employee, generally "controls the method and details of his task and is answerable to the principal as to results only." *Mortgage Consultants, Inc. v. Mahaney*, 655 N.E.2d 493, 495 (Ind.1995) (internal quotation omitted). To determine whether an individual is an independent contractor or an employee, Indiana courts consider, among other things, ten non-exhaustive factors: the extent of control that the principal exercises over the details of the work; whether the individual employed is engaged in a distinct operation or business; whether the work usually is done under the direction of the employer or by a specialist without supervision; the skill required in the particular occupation; who supplies the instrumentalities, tools, and the place of work; the length of time that the individual is employed; whether the individual is paid by the job or by the hour; whether the work is part of the regular business of the employer; whether the parties believe that they have created a master/servant relationship; and whether the principal is in business. *Id.* at 495–96; *see also Restatement (Second) of Agency* § 220

(1958). While no single factor is dispositive, and whether an individual acts as an employee or an independent contractor generally is a question of fact, *see* 655 N.E.2d at 496, courts may make this determination as a matter of law in cases in which the relevant facts are undisputed. *See, e.g., Daugherty v. Fuller Eng'g Serv. Corp.*, 615 N.E.2d 476, 480–81 (Ind.Ct.App.1993).

In support of her argument that UTLX was not an independent contractor, Carter must "set forth specific facts showing that there is a genuine issue for trial." FED. R.CIV.P. 56(e). The district court found that Carter did not set forth specific facts to create a genuine issue on this matter:

> The plaintiff's only relevant argument supporting her position . . . is that Amoco exercised control over UTLX. The plaintiff contends that the UTLX employees at Amoco had no active supervisor and that their instructions came directly from Amoco. However, the plaintiff has not cited to any evidence that would support these allegations.

 Similarly, in her brief to this Court, Carter failed to identify particular facts in the record that support an inference that UTLX was not an independent contractor. Instead, her brief contains conclusory assertions such as "The business of wiping out tank cars is not a distinct operation or business", and "Very little skill appears to be required for this particular operation. Amoco had control over the tank car and the place of work, although the UTLX crew had its own tester. The job of wiping out a tank car takes a very short time, only a few minutes. It is not entirely clear how the job was paid. . . ." Such conclusions do not provide the court with the specific substantiating facts that we require under Rule 56 to create a genuine issue of material fact. *See Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir.1998); *cf. Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct.

---

**2.** The thrust of Carter's argument is that UTLX was not an independent contractor, but rather an Amoco employee. The Court is puzzled as to why Amoco chose not to raise the defense that, as an employee, Carter's sole remedy is provided by the Indiana Worker's Compensation Act. *See Ind.Code* § 22–3–2–6 (stating that the statutory

remedies provided to employees under the Act "shall exclude all other rights and remedies of such employee, . . . at common law or otherwise"). However, Amoco has chosen not to raise the defense and has repudiated it at oral argument. We shall accordingly address the merits of Carter's contention.

3177, 3188, 111 L.Ed.2d 695 (1990) ("The object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."). Neither the district court nor this Court is obligated in considering a motion for summary judgment to assume the truth of a nonmovant's conclusory allegations on faith or to scour the record to unearth material factual disputes. *See, e.g., Uhl v. Zalk Josephs Fabricators, Inc.*, 121 F.3d 1133, 1135–36 (7th Cir.1997).

Amoco, on the other hand, has pointed to evidence in the record supporting its assertion that UTLX was an independent contractor, and we shall consider it briefly. The evidence indicates that Amoco exercised no control over UTLX's work, as it did not supervise or instruct UTLX on how to perform the requested work. The extent of Amoco's involvement was merely to tell UTLX which tank cars needed work and to determine that the work was completed satisfactorily. As indicated above, UTLX had its own safety and tagging procedures, and UTLX employees were not required to follow Amoco safety procedures. In addition, UTLX provided its own equipment to clean and repair tank cars, tasks that are distinct from Amoco's business as a refinery. Amoco paid UTLX by the job, and the parties believed that they had established an independent contractor relationship. In light of this evidence and the factors discussed in *Mahaney*, the only reasonable inference that we can make is that UTLX was an independent contractor.

### 2. Amoco's Duty to Protect UTLX Employees

■ Even if UTLX was an independent contractor, Carter argues that Amoco through its actions assumed a duty to protect UTLX employees, and that there exists a genuine issue as to whether Amoco breached that duty in this case. As a general matter, property owners have no duty to provide independent contractors with a safe place to work, although they do have a duty to maintain their property in a reasonably safe condition. *See, e.g., Burrell v. Meads*, 569 N.E.2d 637, 640 (Ind.1991); *Adams v. Inland Steel Co.*, 611 N.E.2d 141, 143 (Ind.Ct.App. 1993). "[L]andowners generally are required to warn independent contractors of latent or concealed perils on the premises, and they may also become liable to independent contractors if they gratuitously assume a duty to provide a safe work place." *McClure v. Strother*, 570 N.E.2d 1319, 1321 (Ind.Ct.App. 1991) (citation omitted).

■ The evidence does not create a reasonable inference that Amoco assumed a duty to provide a safe work place for UTLX employees. On this point, the district court concluded that "there is no evidence of probative value, nor reasonable inferences which could be drawn therefrom, which could cause reasonable minds to differ regarding whether Amoco assumed a duty to protect Carter." Carter has provided similarly sparse evidence on this point on appeal. She has pointed to evidence indicating that Amoco required its independent contractors, which included UTLX, to implement *some* safety procedures. However, the law is clear that a landowner does not assume a duty to provide for the safety of independent contractors simply by requiring those contractors to administer and comply with safety rules. *See, e.g., Adams*, 611 N.E.2d at 144 ("A landowner who does not control the 'manner or means' by which a contractor performs does not reserve the control of job site safety so as to render the landowner liable for a contractor's injuries merely because the owner contractually requires compliance with safety rules."). Carter has not demonstrated that Amoco provided the significant level of supervision necessary to support an inference that Amoco assumed a duty to protect UTLX workers' safety. *See, e.g. Bateman v. Central Foundry Div.*, 992 F.2d 722, 725 (7th Cir.1993). Rather, the evidence, including the deposition testimony of UTLX employees Anderson and Danny Bouchee, indicates that UTLX used its own safety equipment, followed its own safety procedures, was not subject to Amoco's safety procedures, and informed its employees not to rely on Amoco "safe" tags as an alternative to conducting their own safety tests. Thus, we conclude that the evidence does not establish a reasonable inference that Amoco assumed a duty to protect UTLX employees' safety.

Moreover, the evidence does not create an inference that Amoco was otherwise negligent in failing to warn Carter regarding the hazardous conditions posed by the tank cars. In Indiana, a landowner is not liable for injuries that are caused by conditions that are known or obvious unless the landowner can anticipate that injury despite the obviousness of the risk. *See Douglass v. Irvin*, 549 N.E.2d 368, 370 (Ind.1990). Notwithstanding the evidence indicating that Amoco did not know that tank car GATX 40998 contained nitrogen, there is no evidence in the record to suggest that Amoco should have known that UTLX employees would disregard the risks posed by entry into confined spaces. Amoco hired UTLX to maintain its tank cars, and UTLX implemented safe entry procedures to safeguard against risks that were common knowledge in the industry. There is no evidence indicating that Amoco breached any duty that it may have owed Carter.

### B. Tri-Central and Lyondell's Liability

Carter argues that Tri-Central and, vicariously, Lyondell, negligently failed to warn of the presence of nitrogen in the tank car. In order to prevail on her claim, Carter must establish (1) that Tri-Central owed a duty to her husband; (2) that Tri-Central breached that duty by negligently failing to conform its conduct to the requisite standard of care; and (3) that Tri-Central's negligence caused (both proximately and in fact) her husband's injury. *See, e.g., Dickison v. Hargitt*, 611 N.E.2d 691, 694 (Ind.Ct. App.1993). The district court concluded after a lengthy analysis that any negligence that occurred did not proximately cause Carter's death. While the appellees agree with the district court that Tri-Central's negligence was not the proximate cause of Carter's death, they also argue that Tri-Central did not have a duty to warn Carter. We may affirm an award of summary judgment on any ground that appears in the record. *See, e.g., United States v. Winthrop Towers*, 628 F.2d 1028, 1037 & n. 4 (7th Cir.1980). We agree with the appellees' argument that they had no duty to warn Carter of the hazards posed by the tank car. Therefore, we need not reach the issue of proximate causation.

A duty to warn is predicated upon the understanding that individuals who have superior knowledge of the dangers posed by a hazard must warn those who lack similar knowledge. When an individual is already aware of the danger, a warning is not necessary. "A duty to warn exists only when those to whom the warning would go can reasonably be assumed to be ignorant of the facts which a warning would communicate. If it is unreasonable to assume they are ignorant of those facts, there is no duty to warn." *Burton v. L.O. Smith Foundry Prods. Co.*, 529 F.2d 108, 111 (7th Cir.1976) (per curiam) (applying Indiana law); *see also Czarnecki v. Hagenow*, 477 N.E.2d 964, 968 (Ind.Ct.App.1985) ("Our decisions recognize that there is no 'duty' to warn concerning dangers which are open and obvious or known to the party injured.").

Applying this principle to the facts of the instant case, Carter cannot establish that Tri-Central had a duty to warn her husband about the hazards posed by nitrogen stored in a tank car. John Carter had worked in the industry for many years and had received instructions and training concerning safety procedures for entry into confined spaces. Indeed, Carter even refused to enter a tank car that he did not know to be safe only a month before his death. While this fact may establish an inference that Carter would not have entered tank car GATX 40998 intentionally without having tested it first, and that he may have fallen in, or fallen victim to the nitrogen while attempting to rescue his partner Anderson, these inferences are not relevant to the issue of whether Tri-Central had a duty to warn Carter. The only reasonable inference supported by the evidence is that Carter was well aware of the risk of asphyxiation posed by entry into any confined space. Thus, Carter's knowledge of the danger indicates that Tri-Central had no independent duty to warn him that this particular tank car was dangerous. *See id.*

Carter has conceded that if we affirm the district court's award of summary judgment in favor of Tri-Central, Lyondell cannot be held independently liable. Accordingly, we

affirm the district court's award of summary judgment in favor of both Tri–Central and Lyondell.

### III. Conclusion

For the reasons stated herein, we affirm the district court's entry of summary judgment in favor of the appellees.